407 So.2d 535 (1981)
Lee HAYDEN
v.
John FORYT.
No. 52876.
Supreme Court of Mississippi.
December 2, 1981.
Rehearing Denied January 6, 1982.
*536 Gillis, Walman & Gillis, Norman B. Gillis, Jr., McComb, for appellant.
T. Mack Brabham, McComb, for appellee.
Before PATTERSON, C.J., and SUGG and LEE, JJ.
LEE, Justice, for the Court:
John Foryt filed suit against Lee Hayden, Southwest Mississippi Regional Medical Center (SMRMC), and Tom Logue, administrator, in the Circuit Court of Pike County, Honorable Joe N. Pigott presiding, for damages resulting from defamation and actionable words. The jury returned a verdict in favor of Foryt in the sum of $500,000, a remittitur was entered by the circuit judge reducing the award to $75,000, which was accepted by Foryt. The suit was dismissed by the trial judge as to the hospital and the administrator. Hayden has appealed to this Court. We reverse.
We consider as one assignment whether the lower court erred in refusing to grant a peremptory instruction and motion for judgment n.o.v. on behalf of the appellant and whether the verdict was contrary to the overwhelming weight of the evidence, which questions dispose of the case.
The law of the case sub judice is stated in Benson v. Hall, 339 So.2d 570 (Miss. 1976), where the Court said:
This Court is committed to the rule that although the law guards jealously the enjoyment of a good reputation, public policy, good morals, the interests of society, and sound business principles demand that an employer, or his representative, should be permitted to discuss freely with an employee charges made against an employee affecting the latter's employment. On such occasions there is a qualified privilege, and statements made within the scope of the privilege, in good faith and without malice, are not actionable. Killebrew v. Jackson City Lines, Inc., 225 Miss. 84, 82 So.2d 648 (1955). (339 So.2d at 572)
And:
When qualified privilege is established, statements or written communications are not actionable as slanderous or libelous absent bad faith or malice if the communications are limited to those persons who have a legitimate and direct interest in the subject matter. The qualified privilege may be likened to a circle insofar as its area of protection is concerned. Depending upon the circumstances, the circle encloses those people who have a legitimate and direct interest in the subject matter of the communication, and publication to them is not actionable. If publication is made to persons outside the circle  those not having a legitimate and direct interest in the subject matter of the communication  the protection of the privilege may not be invoked. (339 So.2d at 573)
The record here consists of six volumes which we have carefully reviewed and no useful purpose would be accomplished by setting out the charges, counter charges and bickering on the part of the parties and their supporters. We approach this discussion with the principles in mind stated in Benson, supra, (1) whether or not a qualified privilege was established and (2) if so, were the statements and written communications by appellant made in good faith and without malice? Appellee's case is based on two general incidents.

I.
Appellant was employed by the SMRMC in June of 1976 and was promoted to the rank of chief anesthetist in February 1977. There were several anesthetists employed at the center, including appellee, who had been employed as a staff anesthetist prior and subsequent to the time appellant *537 was chosen as chief anesthetist. There was no anesthesiologist on the staff, but Dr. Ralph Dunn, a Jackson anesthesiologist, provided the department with statements of policy and procedural guidelines. The record reflects that appellee was disappointed in appellant's appointment as chief anesthetist, superior to him, and he held resentment and ill will toward appellant. Appellee objected to the manner in which the work load was scheduled, which he thought to be unfair, and objected to appellant's working as an anesthetist at the Beacham Hospital in Magnolia, Mississippi, on his days off. He accused appellant of charging the hospital for overtime that had not been worked and he accused him of stealing.
Upon selecting appellant as chief anesthetist, Thomas Logue, the executive administrator of the SMRMC, instructed and authorized appellant to bring about stability in the Department of Anesthesia, to eliminate personnel conflicts, to formulate guidelines as to what procedures and techniques should be employed, and to correct other inefficiencies in the department. Appellant prepared new and up-to-date guidelines for the staff to follow in administering anesthesia, he revised the department handbook, and the work schedules were altered in an attempt to spread out the work load more equitably among the staff. With the assistance of Dr. Dunn, the department was furnished with definite statements of policy and procedural guidelines, and the information and handbooks were distributed to each staff member, including appellee, and were put into effect during the latter part of 1977. Executive Administrator Logue instructed members of the staff to follow the new guidelines and policies or to resign.
Appellee refused to comply with the new guidelines and policies implemented by appellant and stubbornly continued to stick to his own procedures when he administered anesthesia at the hospital. He testified at trial that he would not use the new procedures prescribed in the revised department handbook because he felt that his way was just as safe, and he admitted that he never even bothered to read the new revised handbook, as requested by appellant and as instructed by the hospital administrator. Appellant met with appellee several times in informal counseling sessions in an attempt to persuade him to follow the new guidelines as other members of the staff had agreed to do. However, appellee never made any attempt to follow the guidelines and the personal relationship between the two men continued to deteriorate.
On May 6, 1977, appellant summoned appellee to his office for a confidential oral counseling session. Appellant had previously filled out the standard from used by the hospital staff in such situations. The report stated appellee was arrogant and contemptuous and was attempting to disrupt the department, that he lacked qualities of a truly professional anesthetist and was allowing his personal grudge against appellant to interfere with his duties as an anesthetist and had become an artless mind in his acts to sabotage the department. He further stated that appellee followed unsafe anesthesia procedures and techniques, lacked or failed to demonstrate knowledge of physiology necessary to practice anesthesia, refused to properly chart patient's anesthesia experience and failed to follow established departmental guidelines. This instrument, designated as Exhibit P-2, is the first basis for appellee's suit. Appellee employed an attorney and a meeting was requested with the hospital administrator. On May 9, 1977, a conference was held in the administrator's office and those persons present were Mr. Logue, the administrator, appellant, appellee and his attorney, the hospital's attorney and Dr. Sanders, chief of surgery. At the request of appellee and suggestion of the hospital administrator, appellant prepared a 5-page memorandum in support of the charges stated in the Exhibit P-2. Upon the request of Dr. Sanders, appellant appeared before the monthly surgical staff meeting, attended by all members of the hospital medical surgical staff, except for one physician on leave, and reviewed the charges to them.
Later in May 1977, appellant and appellee again met with Administrator Logue, for a discussion of the matter and at the suggestion *538 and insistence of Administrator Logue, they reached a compromise and reconciled their differences. Appellant agreed to withdraw the charges in the report, Exhibit P-2, and destroy it, and appellee agreed to abide by the new guidelines and accede to appellant's authority. The report was never placed in appellee's employee file, although, for some unexplained reason, the hospital attorney did retain a copy of the report.
Those persons present in the meetings involving incident No. 1 were the following:
1. Thomas O. Logue, the Hospital Administrator
2. William C. Hewitt, Assistant Administrator
3. Dr. Henry Sanders, Chief of Surgery Service
4. Dr. Gene Price, Chief of Medical Staff
5. Surgery Service Physicians and Secretary
6. Thomas Parker, President of the Board of Trustees
7. The attorneys for the parties
8. The Vice Chief of Staff
We are of the opinion that the persons present in those meetings were directly interested in the matter and that the qualified privilege prevailed on account thereof. Benson, supra.

II.
The personal conflict between appellant and appellee seemed to diminish after the last May 1977 meeting when the parties agreed to compromise and reconcile their differences. However, appellee had problems and testified that he began to drink alcohol more heavily at night and often took valium to relieve his nervous tension. Whether these things had any effect on appellee's professional ability is not demonstrated in the record. However, in the latter part of September and the first part of October 1977, according to appellee, the second basis for his suit arose, as the result of three separate incidents. Appellant charged that (1) appellee failed to properly administer anesthesia to a patient in the operating room and the patient experienced great pain during the surgery, appellant's chart on the patient showed the normal vital readings, but some of appellee's entries did not correspond with the monitor readings. The incident was reported to Administrator Logue by Dr. Causey, a visiting anesthesiologist; (2) an elderly patient was admitted to the hospital for a follow-up operation, and she refused to allow appellee to administer the anesthesia, contending that appellee had failed to put her to sleep during her first operation; and (3) appellee failed to properly monitor the fluid levels of a critically ill patient and, as a result, the patient went into respiratory failure and had to be resuscitated.
Appellant expressed concern for the welfare of each patient under appellee's care and reported the incidents to Administrator Logue. At Logue's request, Dr. Ralph Dunn, the consulting anesthesiologist, summarily reviewed the three cases and suggested that appellee be suspended pending a full investigation. Appellee was presented with the charges and was informed that, in the event the investigation supported them, he would be terminated. Rather than risk such outcome of the investigation, appellee resigned from the Department of Anesthesia at SMRMC and entered the employ of the University Medical Center in Jackson.
The three incidents set forth hereinabove were reported to persons who had a direct interest in the matter and, in our opinion, the qualified privilege existed.

III.
Since we hold that the qualified privilege was in effect at all times the alleged defamatory matters were communicated and published, the crucial question now is whether or not they were made in good faith and without malice.
The hospital rules applicable to all employees of SMRMC provide the following:
m. Insubordination or refusal to take orders from the supervisor of Department *539 Head. This includes among other things, refusal of any employee to satisfactorily perform any task, duty or job within reason assigned to the employee by his supervisor or to disobey his supervisor's instructions. (Employees are to follow instructions; any complaint may be taken up later as a grievance.)
It was the duty of appellant to report any matters which he considered in violation of the rules and guidelines of his department to his superiors. He apparently made a good faith attempt to support the charges in the Exhibit P-2 by preparing a 5-page memo for the benefit of appellee and the administrator. Likewise, he brought the incidents constituting ground No. 2 to the attention of the administrator, who arranged forthwith for an investigation of the matters by Anesthesiologist Dr. Ralph Dunn with the result that appellee resigned before that investigation could be made.
In Scott-Burr Stores Corp. v. Edgar, 181 Miss. 486, 177 So. 766 (1938), the Court said:
Actual or express malice, as distinguished from malice in law, in its ordinary sense denotes ill will, a sentiment of hate or spite, especially when harbored by one person towards another, and exists when one with a sedate, deliberate mind and formed design injures another, as where the person is actuated by ill will in what he does and says, with a design to willfully or wantonly injure another. Newell on Slander and Libel, 4th Ed. § 271 et seq. (181 Miss. at 503-504, 177 So. at 770).
And:
In Newell on Slander and Libel, § 292, it is stated that, "If the defendant honestly believed the plaintiff's conduct to be such as he described it, the mere fact that he used strong words in describing it is no evidence of malice. The fact that the expressions are angry and intemperate is not enough; the proof must go further and show that they are malicious."
The following rule is announced in Newell on Slander and Libel, 3d Ed., § 397:
"If the evidence adduced is equally consistent with either the existence or the nonexistence of malice, there can be no recovery, for there is nothing to rebut the presumption which has arisen in favor of the defendant from the privileged communication." Gust v. Montgomery Ward & Co., 229 Mo. App. 371, 80 S.W.2d 286; Rosenberg v. Mason, 157 Va. 215, 160 S.E. 190, 202. In the Rosenberg Case the court in dealing with a privileged occasion, said: "It is not sufficient in a case such as this that the evidence be consistent with the existence of actual malice, or even that it raise a suspicion that the defendant might have been actuated by malice or a doubt as to his good faith. It must affirmatively prove the existence of actual malice, and to do so it must be more consistent with the existence of actual malice than with its nonexistence." (181 Miss. at 507-508, 177 So. at 771-772)
Institutions such as SMRMC were founded by the labor, contributions and sacrifices of many persons to render medical assistance for physically and mentally afflicted people without bias or prejudice to any individual. Employees and representatives of such institutions should consider them and their welfare above personal animosities and ambitions. It is unfortunate and regrettable that professional men, as in the present case, permit personal differences to become involved, which affect vital parts of a fine hospital. In such instances, discipline must be administered by those people in authority whose responsibility and allegiance are to the institution. We hold that the proof in this case, under all the evidence and circumstances, does not prove the existence of malice on the part of appellant in making the charges and reports which are the basis of the suit, and that the appellee has not established his case against the appellant.[1]
Therefore, the judgment of the lower court is reversed and judgment is rendered here for the appellant.
REVERSED AND RENDERED.
*540 PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, BOWLING and HAWKINS, JJ., concur.
NOTES
[1] The learned trial judge followed the Court's opinion in Claiborne v. Greer, 354 So.2d 1109, 1111 (Miss. 1978), by submitting the case to the jury and ruling on motion for j.n.o.v. after verdict. Regardless of his ruling on j.n.o.v. the case is finally decided here.