# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 1999-CA-00455-COA

**PETESY SMITH**                                                                **APPELLANT**

**v.**

**TAMMY WHITE**                                                                 **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/09/1999 |
| TRIAL JUDGE: | HON. ISADORE W. PATRICK JR. |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHARLES R. WILBANKS JR. |
| | KIMBERLY PINE TURNER |
| | BARRY C. CAMPBELL |
| ATTORNEY FOR APPELLEE: | ROBERT H. PEDERSEN |
| NATURE OF THE CASE: | CIVIL - OTHER |
| TRIAL COURT DISPOSITION: | JURY VERDICT FOR APPELLANT IN SUM OF $5,000, PLUS AWARD OF $1,506 IN COSTS |
| DISPOSITION: | REVERSED AND RENDERED - 1/9/01 |
| MOTION FOR REHEARING FILED: | 1/23/2001; denied 3/13/2001 |
| CERTIORARI FILED: | 3/27/2001; granted 6/28/2001 |
| MANDATE ISSUED: | |

EN BANC.

McMILLIN, C.J., FOR THE COURT:

¶1. This case comes before the Court both as a direct appeal and a cross-appeal from a jury verdict and resulting judgment in the amount of $5,000 plus court costs of $1,565.06 in favor of the plaintiff, Petesy Smith. The judgment is based on a claim for defamation filed by Smith against White in the Circuit Court of Warren County. Smith appealed from the verdict entered in her favor, contending primarily that the trial court erred in refusing to permit the jury to consider awarding her punitive damages and attorney's fees. Smith also contends that the trial court erred in concluding that the alleged defamatory remarks were subject to a qualified privilege and instructing the jury accordingly. More particularly, Smith contends that remarks were slanderous *per se*, in that they accused her of criminal activity and were also intended to injure her in her profession.

¶2. The defendant, Tammy White, filed a cross-appeal in which she contends that the jury verdict was against the weight of the evidence, in that Smith had failed to carry her burden to show that those persons to whom the allegedly defamatory words were published considered them to be slanderous. White also contends that all the allegedly defamatory statements were subject to a qualified privilege and Smith failed to prove the necessary element of malice required to overcome the qualified privilege.

¶3. For reasons we will proceed to set out, we conclude that the allegedly defamatory remarks made by White were not slanderous *per se* and Smith failed to prove that the hearers of the remarks understood them to be defamatory. Additionally, we find that the trial court was correct in concluding that the remarks were subject to a qualified privilege and we further conclude that the evidence was insufficient to demonstrate the requisite malice necessary to overcome the privilege. Either of these separate findings is fatal to Smith's claim of defamation. We, therefore, reverse and render judgment in favor of the appellee, Tammy White.

## I.

## Facts

¶4. Smith has a long history of service as a volunteer in various organizations involved in protecting children's well-being. One such activity was her work as a volunteer child advocate in the Child Advocate Program (CAP), an organization funded through private grants, donations, fund-raisers, and grants from state and local governmental organizations. Under that program, volunteers agreed to serve, on a case-by-case basis, as "advocates" for children involved in Youth Court proceedings or coming under the purview of the Department of Human Services (DHS), in the hope that these volunteers can provide a helpful but dispassionate voice in any such proceeding on the child's behalf. In addition to her duties as a child advocate in the CAP program, Smith also served as local chairperson for an unrelated organization known as the Warren County Family Advocacy Committee. Her duties in that position were more general, since the focus of that organization's mission was to seek systemic changes in the treatment of children coming under the eye of public authorities rather than undertaking to intervene in a particular child's case. The proof is uncontradicted that, in her role as chairperson for the Warren County Family Advocacy Committee, Smith was at times critical of the operation of the local DHS, and was, in fact, often quite outspoken in her criticism.

¶5. White served as director for the Child Advocate Program (CAP) and, in that capacity, was responsible for supervising all volunteer child advocates. After being shown information by an employee of DHS that indicated that Smith was representing herself as the designated advocate in a particular child's case when, in fact, she was not, White returned to CAP offices and had a conversation about the matter with Walley Flowers, who was at the time acting as president for CAP. The conversation turned to the question of how a form generated in the CAP offices that had made its way into a DHS file could incorrectly show Smith as the designated advocate for this particular child. White called in Angela Carpenter, who worked as a clerical employee for CAP, and requested that she pull the file in order to investigate the matter further. During the course of the conversation, White speculated aloud as to how Smith's name could have gotten into the file as the child's advocate and remarked that Smith did have a key to the offices. However, immediately upon the file being pulled, it was discovered that another volunteer performing clerical duties had mistakenly listed Smith on the form in question as the child's designated advocate.

¶6. Nevertheless, because of other concerns regarding Smith's activities in her dual roles, White testified that she had become convinced that it was not in the best interest of CAP for Smith to continue acting as volunteer advocate. White expressed two basic concerns in her decision to sever Smith's participation. First, she expressed concern that Smith's open criticism of local DHS employees' performance could hamper her ability to work closely with those same DHS employees as an advocate on behalf of a particular child. Secondly, she was concerned that Smith would have the opportunity to use information

gained while serving as a child advocate as evidence to support her general complaints against the local DHS that she was making at the state level.

¶7. After her decision to end Smith's participation as a child advocate volunteer, there was a meeting of the CAP Executive Committee to discuss White's decision. White informed those present of the circumstances surrounding her decision and, in the course of reporting the facts, informed the members of her remark to Walley Flowers about Smith having a key to the CAP offices. At that same meeting, White distributed to all present a written summary of her recollection of the critical events, which included a complete recitation of the facts as to how Smith's name had incorrectly but inadvertently been listed as the designated advocate for the particular child in question.

## II.

## Smith's Theory of the Case

¶8. Smith sued White for slander arising out of certain statements she claimed White made during the course of the events described above. More particularly, Smith relies on two separate incidents in which she claims she was defamed by words spoken by White.

¶9. The first instance is said to arise out of White's remark to Walley Flowers and Angela Carpenter in the CAP offices, shortly after White's encounter with a DHS employee, that Smith had a key to the offices. Smith contends that, in the context in which that comment was made, it was evident that White was falsely accusing Smith of using her key to gain surreptitious entry to the CAP offices and falsify official CAP documents to list herself as a particular child's designated advocate when, in fact, she was not. Smith contends that the remark, understood in that light, was slanderous *per se* in that it (a) wrongfully accused her of committing a crime, and (b) was intended to injure her in her profession as a champion of children's rights.

¶10. The second instance was said to have occurred at the executive committee meeting. In this setting, Smith contends that White's decision to repeat her comment regarding Smith's possession of a key to the CAP offices was another instance of falsely accusing Smith of illegal activity. Not surprisingly, one of White's defenses to this claim is that all her comments complained of by Smith were subject to a qualified privilege that rendered them not actionable unless Smith could demonstrate that they were made with actual malice. To this defense, Smith counters that, because White had already learned the circumstances of how Smith had been erroneously listed as the child's designated advocate, the repetition of the remarks with their attendant implications of wrongful conduct was necessarily a malicious utterance.

¶11. Smith also contends that, at the executive committee meeting, White falsely and maliciously accused Smith of making improper use of information obtained by her while acting as a child advocate under CAP's program.

## III.

## A Summary of the Pertinent Issues

¶12. By way of cross-appeal, Tammy White claims essentially that Petesy Smith failed to carry her burden of establishing the necessary facts to entitle her to recover a jury verdict in any amount. We will consider the issues surrounding that contention first since, if they have merit, any question regarding the treatment of

Smith's punitive damage claim is rendered moot.

¶13. The trial court, after hearing the evidence, determined that all of White's statements were made in the course of her official duties as director of CAP and were made to others engaged in their capacity as executive committee members. As such, the trial court ruled as a matter of law that White's statements were subject to a qualified privilege that shielded White from liability for her statements unless Smith could prove that the statements were made with malice. The jury was instructed accordingly and returned a verdict for Smith in the amount of $5,000 plus court costs of $1,565.06. Smith, despite the jury verdict in her favor, alleges that the trial court erred in ruling that White's comments were subject to a qualified privilege as a matter of law, contending that the matter of the existence of the privilege was a question of fact that could only be resolved by the jury. Since Smith prevailed on her claim for slander at trial, it is difficult to envision what relief Smith would have this Court give on that issue, were we to conclude that it had merit, since she prevailed on her claim despite the higher burden imposed by the trial court's ruling. However, for reasons that will follow, we find it unnecessary to address that somewhat perplexing question.

¶14. White's cross-appeal, which necessarily begins with the assumption that the trial court was correct in concluding that all remarks claimed by Smith as actionable were subject to a qualified privilege, contends essentially that Smith failed to prove by clear and convincing evidence the requisite malice or ill-will required to overcome the privilege. White also contends, more basically, that White's statements as proven at trial simply were not actionable because there was no evidence that those persons who heard the statements understood them to be defamatory of Smith's reputation or character.

## IV.

### The Issue of Qualified Privilege

¶15. Mississippi has long recognized the existence of a qualified privilege to make remarks concerning a person that, on their face, may be less than complimentary if they are made "in good faith and on a subject matter in which the person making it has an interest, or in reference to which he has a duty . . . provided the statement is made without malice." *Louisiana Oil Corp. v. Renno*, 173 Miss. 609, 157 So. 705, 708 (1934). In this case, there can be little doubt that the remarks made by White were covered by that privilege. She was the director of CAP and, as such, had supervisory responsibility for the day-to-day operation of the organization. This responsibility certainly extended to the matter of the performance of volunteer advocates working in the CAP program.

¶16. The evidence is uncontradicted that White, in her capacity as CAP director, became aware of information from a DHS employee that reasonably led her to believe that internal CAP documents incorrectly named Smith as the designated advocate for a particular child. White also was made aware of information that Smith was, beyond question, taking an active role in the progress of youth court proceedings relating to that child, including drafting letters to the youth court judge expressing her concerns as to how the matter was being handled.

¶17. It is difficult to argue that, armed with that information, White did not have the authority to investigate the matter further, and it was in that context that White returned from her meeting with the DHS official to CAP offices and began the inquiry into Smith's activities in this particular child's case. Based on what she had learned from the DHS official, White had a conversation with two individuals at CAP offices. One of them was Walley Flowers, who was at the time president of the CAP Board and who, by virtue of that

position, should have had an interest identical with White's to determine if any impropriety had occurred in the operation of the child advocacy program. The other was Angela Carpenter, an employee of the organization. Addressing the first and most obvious issue, White began an informal inquiry into how a copy of a CAP form incorrectly designating Smith as the child's designated advocate could have made its way to the child's official DHS file, and in the earliest stage of that inquiry remarked to Flowers that, after all, Smith did have a key to the CAP offices. Only moments after making that remark, White, Flowers, and Carpenter viewed the actual CAP file and all became satisfied that, though the CAP form did incorrectly designate Smith as the child's sanctioned advocate, the error was inadvertent and in all likelihood traceable to a misunderstanding of Smith's role by a volunteer performing clerical work. The only other time allegations regarding Smith's possession of a key were made was when White reported the entire incident to the executive board members and, in the context of that meeting, whatever oral remarks she may have offered (the evidence on that point being sketchy at best) were accompanied by her written summary which unequivocally put to rest any implication that Smith may have wrongfully played some role in the falsification of CAP records.

¶18. Citing principles of public policy, the Mississippi Supreme Court recognized that certain statements, though undoubtedly derogatory of another person, may nevertheless be protected if made in good faith and made in the context where both the speaker and the hearer have a common interest in the subject matter. *Louisiana Oil Corp. v. Renno*, 157 So. 705 at 708. The supreme court specifically recognized the existence of such a privilege in the situation where a hospital's chief anesthetist offered disparaging comments regarding a staff anesthetist's performance in a report to supervisory hospital authorities. *Hayden v. Foryt*, 407 So. 2d 535, 538 (Miss. 1981).

¶19. Applying those principles to the facts of this case, we are satisfied that the trial court was correct in deciding the question of the existence of the privilege.

> The question of privilege is for the court on a given state of facts; if the facts are undisputed, the court decides the question and instructs the jury peremptorily; if the facts are disputed, the court submits the question to the jury to determine whether the necessary facts existed.

*Louisiana Oil Corp. v. Renno,* 157 So. at 708. In this case, Smith has not suggested any dispute in the facts that would need to be resolved by the jury as to context in which White's allegedly actionable remarks were offered or as to the common interest between the speaker and those alleged to have heard the comments. Any claim that the trial court erred in resolving the issue of the existence of a qualified privilege in favor of White is, therefore, without merit.

## V.

### Slander Per Se

¶20. Smith claims that White's remark that Smith had a key to the premises constituted slander *per se* under established Mississippi law on the subject, since the statement falsely accused Smith of criminal activity. *See, e.g., Baugh v. Baugh*, 512 So. 2d 1283, 1285 (Miss. 1987), *Smith v. Byrd*, 225 Miss. 331, 342, 83 So. 2d 172, 174 (1955). Smith alleges error in the trial court's refusal to appropriately instruct the jury as to slander *per se*.

¶21. The statement by White did not directly impute any sort of criminal activity to Smith. It was, on its

face, entirely true since it is not disputed that Smith did have a key to the premises. In order to read into the statement an accusation of criminal activity, one must determine that White intended to indirectly charge such conduct by implication or innuendo. The first time the statement was made was when the investigation of the matter was in its earliest stages and could easily have been interpreted as nothing more than a mention of a possibility that should be explored, rather than a direct accusation of criminal activity. In the situation where a remark is capable of more than one interpretation, one of which is not slanderous, the plaintiff is obligated as a part of her proof to show that the hearer of the statement reasonably understood the remark to be defamatory. *Montgomery Ward & Co. v. Skinner*, 200 Miss. 44, 72, 25 So. 2d 572, 580 (1946); *Taylor v. Standard Oil Co.*, 184 Miss. 392, 186 So. 294, 296 (Miss. 1939). Smith presented no evidence that anyone who heard White's remarks reasonably understood that she was accusing Smith of any improper, much less illegal, activity. Walley Flowers, in speaking of what White had said during their encounter at the CAP offices, related to the jury his recollection of the conversation. He said that, in response to his inquiry as to what was wrong, "She [White] made reference to a letter that she said she had seen in the DHS office. Something to the effect that the letter contained Petesy's name, and some information that Petesy supposedly should not have had knowledge of." That statement does not, by any stretch of interpretation, support a conclusion that Flowers reasonably understood that White was accusing Smith of having committed a crime.

¶22. The only other occasion at which White allegedly accused Smith of criminal activity was during the executive committee meeting that ensued a few days after White's decision to end Smith's work as a volunteer for CAP. While White admitted that she repeated her statement that Smith had a key to the premises, she testified that the statement was made in the context of giving the board the entire history of the affair and that she did not intend to imply that Smith had used the key in an improper measure. Evidence to support this interpretation is found both (a) in the fact, as White pointed out, that Walley Flowers was present at the executive committee meeting so that it would have been nonsensical to accuse Smith of falsifying CAP records in Flowers's presence when he was already aware of how the erroneous entry had come to be, and (b) by virtue of the fact that White, at the same time she was orally communicating events, circulated a written summary of the events that included a full explanation as to how the erroneous entry in the CAP record had been created. Smith did not counter this seemingly overwhelming evidence with any evidence that any person present at the meeting understood White to be accusing Smith of some form of criminal activity.

¶23. Smith called witnesses, including Flowers, who were present at the executive committee meeting. Flowers only testified that, at the executive committee meeting, "She [White] explained very briefly and very vaguely the letter that I mentioned." He went on to say that, shortly after the meeting began, he became dissatisfied with the way the matter was being handled and left. Chad Sonnek was asked directly if White had ever accused Smith of breaking into the CAP offices and replied in quite direct fashion that she had not. James Wilkerson said that, in the course of a general discussion by the board about possible improper access to the CAP office by the use of a key, White herself remarked "I don't think she [Smith] would do that." During Donald Brown's testimony, the following exchange occurred uninterrupted by any challenge to the leading nature of Smith's counsel's question:

Q. And during that meeting, Tammy White speculated that Petesy had a key and had access to the CAP Center and could have gotten some information that way; is that right?

A. Well, it wasn't exactly that way. It was the fact that Petesy's name had, I guess, inadvertently been

listed as the [advocate] assigned to a particular case that I think this letter was written about. And the question was: How did that happen? And so we were looking at different options of how that could have happened. Whether that was a clerical error or whether Angela Carpenter, the person over it had one it, or, you know, just said: Well, what else could have happened? Well, Petesy did have a key. It was during the time of the fundraiser. And again, it was just an option. I don't think it was said that: Yes. This is how it probably happened.

¶24. A jury verdict is entitled to great deference. *Parker v. Thornton*, 596 So. 2d 854, 858 (Miss. 1992). An appellate court can disturb a jury's verdict only if it concludes that the verdict "is against the overwhelming weight of the evidence and credible testimony." *Downtown Grill, Inc. v. Connell*, 721 So. 2d 1113 (¶7) (Miss. 1998). In this case, even taking into consideration the normal deference due a jury's verdict, the evidence is entirely unsatisfactory to carry the plaintiff's burden of proof. Smith had the burden, in this defamation action, to show that White's remarks were intended to impute a criminal act to Smith or, at a minimum, that such remarks were capable of and were, in fact, understood by those who heard them to charge Smith with having committed a criminal act.

¶25. The trial court in this case repeatedly admonished counsel for the plaintiff that they were not trying a case for wrongful termination, yet a thorough review of the record leads almost irresistibly to the conclusion that the actual grievance being aired was Smith's intense dissatisfaction with having her involvement as a child advocate ended against her will. That the jury may have agreed that this was the central grievance can be seen by the fact that the jury, after it began its deliberations, sent out two questions, the first of which was, "Is it within our realm to ask that Petesy be reinstated as a [child advocate volunteer]?"

¶26. We conclude that the verdict in this case is unsupported by any credible evidence and that it appears to have no stronger foundation than bias or sympathy in favor of Smith. It appears to be based, not on any false and malicious allegations of criminal or improper activity on her part, but on the way in which her service as a volunteer child advocate was terminated. Though such sympathy may be understandable in view of Smith's long history of involvement as a volunteer in worthy public causes, the law is clear that it cannot form the necessary underpinning to uphold the jury verdict for slander.

¶27. In summary, we find that Smith failed to carry her burden of proof to demonstrate that White's remarks about her were reasonably capable of an interpretation that would make them defamatory of Smith's good name and reputation. We further find that, even assuming for sake of argument that White's remarks were capable of a defamatory interpretation, Smith failed to show that anyone who heard the remarks actually understood them as charging Smith with illegal or improper behavior. For that reason, we find that Smith failed as a matter of law to present credible probative evidence to support a finding that White had, either directly or by implication, accused her wrongfully of engaging in unlawful or improper activity in regard to possible falsification of CAP records.

## VI.

### Other Claims

¶28. Smith made an alternate claim that she was defamed by false charges by White that Smith had a conflict of interest by virtue of serving both as chairperson of the Warren County Advocacy Committee and as a volunteer advocate for the CAP Program. Taken in the light most favorable to Smith, White conceded that she did express concern about possible conflicts since she was aware that Smith was, in her role as

chairperson, taking an aggressive posture in attempts to remedy what she perceived to be failings in the operation of the local DHS office. White testified that her concern arose out of the fact that an advocate for a particular child could reasonably be expected to have to work closely with the child's DHS social worker and that this could present practical difficulties. There is no evidence that White did anything other than vocalize these concerns - concerns which, in her role of responsibility for the effective operation of the CAP advocacy program appear entirely reasonable - and there is no proof that White, in fact, falsely accused Smith of somehow improperly conducting herself in either role. This alternate theory of recovery must, therefore, be seen to fail for lack of evidence to support it.

¶29. Smith presented no evidence to support her assertion that White had falsely accused her of actually making improper use of information gained while acting as a child advocate in the CAP program. The burden as to such claim, of course, rested upon Smith and the lack of evidence is fatal to that theory.

¶30. Our determination that White's cross-appeal has merit compels us to reverse and render the verdict in this case. This decision, of course, renders the issues regarding punitive damages raised on direct appeal moot.

¶31. **THE JUDGMENT OF THE CIRCUIT COURT OF WARREN COUNTY IS REVERSED AND RENDERED. THE COSTS OF THE APPEAL ARE ASSESSED TO THE APPELLANT AND CROSS-APPELLEE.**

**KING, P.J., IRVING, LEE, MYERS, PAYNE, AND THOMAS, JJ., CONCUR. BRIDGES, J., DISSENTS WITHOUT WRITTEN OPINION. SOUTHWICK, P.J., AND CHANDLER, J., NOT PARTICIPATING.**