# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-IA-01174-SCT

*INLAND FAMILY PRACTICE CENTER, LLC,*
*AND IKECHUKWU OKORIE, M.D.*

*v.*

*SALLIE M. AMERSON*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/01/2017 |
| TRIAL JUDGE: | HON. JON MARK WEATHERS |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | CHARLES EDWARD COWAN |
| | R. MARK HODGES |
| ATTORNEY FOR APPELLEE: | SALLIE M. AMERSON (PRO SE) |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND RENDERED - 11/08/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., KING AND ISHEE, JJ.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1.     Sallie Amerson sued Inland Family Clinic LLC and Dr. Ikechukwu Okorie over an

allegedly defamatory statement Dr. Okorie made to another physician concerning Amerson's

apparent use of illegal drugs.  The Defendants moved for summary judgment, contending the

statements were privileged, but the Forrest County Circuit Court denied the motion.  Inland

and Dr. Okorie petitioned this Court for interlocutory review, which we granted.  After due

consideration, we reverse the decision of the circuit court and render summary judgment in

favor of Inland and Dr. Okorie.

## FACTS AND PROCEDURAL HISTORY

¶2.     Inland is a family clinic located in Hattiesburg, Mississippi, owned and operated by Dr. Okorie.  Amerson was a patient of Dr. Okorie's from April 2011 to March 2013. Amerson suffers from a variety of ailments, including chronic back pain for which Dr. Okorie prescribed opioid (narcotic) pain medications.  Since opioids are notoriously addictive and can readily be resold on the black market, Amerson was required to comply with Inland's "Pain Management Policy."  The policy informed Amerson that if she were to violate its terms, Dr. Okorie "may stop prescribing [the] pain-control medications."  Specifically, it was an express violation of the policy for Amerson to use "any illegal substances."  She was required to submit to monthly drug screenings, performed by an outside lab, which tested for illegal or non-prescribed drugs.  Amerson signed the policy.

¶3.     In February 2013, Amerson tested positive for amphetamines and methadone—two drugs for which she had no prescription.  Dr. Okorie then informed Amerson he would no longer prescribe her narcotics; Dr. Okorie's notes reflect that his decision was based on Amerson's "prior . . . and present history of taking a non-prescribed narcotic."[1]  While Dr. Okorie offered to continue treating Amerson for her other ailments, he referred her to Dr. Joseph Farina for treatment of her chronic back pain.

---

[1] Dr. Okorie's reference to Amerson's history of abuse was in part supported by previous instances of Amerson's violating fellow physicians' pain management policies. Before seeing Dr. Okorie, Amerson received treatment from Dr. Akwasi Amponsah from August 2008 until March 2011. Dr. Amponsah had ultimately refused to prescribe Amerson certain medications after determining she had obtained narcotics from multiple medical providers.

¶4. Amerson visited Dr. Farina in March 2013, but Dr. Farina refused to prescribe narcotics after discovering that Amerson had already depleted her existing prescription, just sixteen days after it had been filled. That same day, Amerson returned to Dr. Okorie seeking narcotics, which Dr. Okorie again refused to prescribe. A week later, Amerson visited Dr. Jeffery Morris. Dr. Morris had treated Amerson for certain ailments dating back roughly to 2010. Dr. Morris informed Amerson he would need her medical records from Dr. Okorie before he could prescribe anything for her back pain.

¶5. While awaiting Dr. Morris's decision, Amerson again returned to Dr. Okorie. Amerson submitted to another drug screening, and she again tested positive for amphetamines and methadone. Dr. Okorie refused to prescribe Amerson narcotic medications a third time, and Amerson did not visit him again. Then, in early April 2013, Amerson was informed by Dr. Morris's office that he would not prescribe narcotic medications based on Dr. Okorie's statement to him that Amerson had tested positive for "amphetamines and methamphetamines." Dr. Morris conveyed the same to one of his nurses, Hope West, who recorded Dr. Morris's comments on a faxed copy of Amerson's lab results. West wrote that "Dr. Okorie stated he wasn't writing her narcotics due to being positive for amphetamines [and] methamphetamines" and "[patient] notified 4/11/13."

¶6. Apparently, Dr. Okorie was mistaken when he said Amerson tested positive for methamphetamines; the correct interpretation of Amerson's drug test report was that she had tested positive for methadone. Methamphetamines would not have shown up separately in

3

the results as they fell under the "amphetamine" heading.[2]  Claiming that Dr. Okorie's statement to Dr. Morris was false and defamatory, Amerson filed her complaint in June 2013. The crux of her complaint alleged that Dr. Okorie had defamed her by telling others she had used illegal drugs, and, as a result, she suffered personal and economic injuries.

¶7.    Ultimately, Inland and Dr. Okorie moved for summary judgment, arguing that Dr. Okorie's statement to Dr. Morris was protected by a qualified privilege.  The circuit court found genuine issues of material fact remained as to the nature and content of the statement, and it denied summary judgment.  Inland and Dr. Okorie petitioned this Court for interlocutory review, which we granted.

## STANDARD OF REVIEW

¶8.    Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c).  The moving party bears the initial burden of supporting the motion for summary judgment.  *Id*.  But once the motion is properly made and supported, the non-movant "may not rest upon the mere allegations or denials of [her] pleadings, but [her] response . . . must set forth specific facts showing that there is a genuine issue for trial." *Id*. Thus, where the non-movant fails to "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of

---

[2] According to Dr. Okorie, the abbreviation "AMPH" in the drug test's results actually stands for "amphetamines." "METD" stands for "methadone."

4

proof at trial," summary judgment is proper. *McGinty v. Grand Casinos of Miss., Inc.*, 245 So. 3d 444, 448 (Miss. 2018) (citations omitted).

¶9.     We review the grant or denial of summary judgment de novo. *Collins v. City of Newton*, 240 So. 3d 1211, 1215 (Miss. 2018).  But the evidence must be viewed in the light most favorable to the nonmoving party. *Id.*

## DISCUSSION

¶10.    In finding that material questions of fact remained as to "the content and nature of the alleged [defamatory] statement," the circuit court held that Inland and Dr. Okorie failed to show they were entitled to summary judgment because they relied upon a document, Nurse West's note, that was inadmissible hearsay.  We conclude that this impermissibly shifted the burden of production from Amerson to the Defendants and that any issue of fact as to the content of the statement was not material.

¶11.    As we noted above, once the Defendants' motion for summary judgment was properly made and supported, Amerson could "not rest upon the mere allegations or denials of [her] pleadings, but [her] response . . . must set forth specific facts showing that there is a genuine issue for trial." *See* M.R.C.P. 56(c).  For the purposes of summary judgment, Inland and Dr. Okorie conceded Amerson's various allegations regarding the content of the communication from Dr. Okorie to Dr. Morris.  These allegations were laid out in the motion: Amerson said in her deposition that Dr. Okorie had told Dr. Morris she "had illegal drugs in her system"; she asserted in her interrogatory responses that Dr. Okorie had "told Dr. Morris I was on illegal drugs"; and she produced in discovery Nurse West's note about Amerson's drug-test

5

results, detailing that Dr. Okorie had told Dr. Morris that "he wasn't writing [Amerson] narcotics due to being positive for amphetamines [and] methamphetamines."

¶12.   As explained below, the motion for summary judgment showed that all of these statements, accepted as having been made, would still have been privileged.  The motion thus made a prima facie showing that no genuine issue of material fact existed regarding the substance of the alleged statement from Dr. Okorie to Dr. Morris because, regardless of which iteration was accepted, the communication was still privileged.  *See* M.R.C.P. 56(c). Put another way, whatever issues of fact remained as to the content of the statement were not material to the motion for summary judgment.  *See id.*  The Defendants' motion for summary judgment should have carried the initial burden of persuading the trial court that no genuine issue of material fact existed and that they were entitled to summary judgment.  *See* ***Karpinsky v. Am. Nat'l Ins. Co.***, 109 So. 3d 84, 88 (Miss. 2013).   The burden thus shifted to Amerson to "set forth specific facts showing that there is a genuine issue for trial."  *See* M.R.C.P. 56(c).

¶13.   Moreover, as this Court held in ***Karpinsky***, summary judgment "movant[s] only bear[] the burden of production where they would bear the burden of proof at trial."  ***Karpinsky***, 109 So. 3d at 89.  It is axiomatic that Amerson, the plaintiff, would bear the burden of proving the content of the allegedly defamatory communication.  *See* ***Armistead v. Minor***, 815 So. 2d 1189, 1193 (Miss. 2002).  If the note were found to be inadmissible hearsay, it could only hurt Amerson because she, not the Defendants, had to prove what was said.  But, again, the Defendants did not challenge the admissibility of the note.  Instead, they contended

6

that, even if it accurately reflected what was said, the communication would still be privileged.

¶14. Turning to the merits of the qualified-privilege defense, Inland and Dr. Okorie asserted that, even if the statement was made in any of the forms alleged, it was protected by a qualified privilege that Amerson had no evidence of malice to overcome. We agree. Under Mississippi law, an ordinary claim for defamation requires the plaintiff to prove:

> (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Simmons Law Group, P.A. v. Corp. Mgmt. Inc.*, 42 So. 3d 511, 517 (Miss. 2010). If the statement is privileged, the second element cannot be met unless the privilege is overcome by a showing of malice, bad faith, or abuse. *Eckman v. Cooper Tire & Rubber Co.*, 893 So. 2d 1049, 1052 (Miss. 2005). "Where [a] qualified privilege exists, a presumption of good faith arises." *Barmada v. Pridjian*, 989 So. 2d 359, 365 (Miss. 2008) (citing *Hayden v. Foryt*, 407 So. 2d 535 (Miss. 1981)).

¶15. Amerson relies on a single communication from Dr. Okorie to Dr. Morris where Dr. Okorie alternatively "purposely accused [Amerson] of using illegal drugs," "told Dr. Morris [Amerson] was on illegal drugs," or told Dr. Morris that "he wasn't writing [Amerson] narcotics due to being positive for amphetamines [and] methamphetamines."

¶16. This Court has outlined the qualified privilege as

> A communication made in good faith and on a subject matter in which the person making it has an interest, or in reference to which he has a duty, is

7

privileged if made to a person or persons having a corresponding interest or duty, even though it contains matter which without this privilege would be slanderous, provided the statement is made without malice and in good faith.

*Eckman*, 893 So. 2d at 1052 (quoting *Smith v. White*, 799 So. 2d 83, 86 (Miss. 2001)).

¶17.    The qualified privilege operates as an affirmative defense to defamation. *See Whitten v. Commercial Dispatch Pub. Co.*, 487 So. 2d 843, 844 (Miss. 1986); *see also* M.R.C.P. 8(c).  On summary judgment, as at trial, the burden of proving that the qualified privilege attached to the communication falls on the parties asserting it as a defense, Inland and Dr. Okorie.  *See Jenkins v. Pensacola Health Trust, Inc.*, 933 So. 2d 923, 927 (Miss. 2006). That being said, the relevant circumstances surrounding the communication are not disputed.

¶18.    First, the communication was made by Dr. Okorie regarding a subject matter in which he had an interest or in reference to which he had a duty—the treatment of his patient, Amerson, and any related narcotic prescriptions.  Second, Dr. Okorie made the statement to Dr. Morris—a fellow physician from whom Amerson was also seeking narcotic prescriptions.  Dr. Morris therefore had a corresponding interest or duty in the medical treatment of Amerson.  Finally, nothing in the record evidences a lack of good faith by Dr. Okorie in his statement to Dr. Morris.

¶19.    A review of our prior decisions demonstrates that this application of the qualified privilege to physician-to-physician statements is not unusual.  For example, in *Hayden*, this Court addressed an allegedly defamatory statement of a supervising physician regarding the competence of a subordinate physician.  The supervising physician discussed the issue with administrators and also at a surgical staff meeting "attended by all members of the hospital

8

medical surgical staff, except for one physician on leave." *Hayden*, 407 So. 2d at 537. We concluded that "the persons present in those meetings were directly interested in the matter." *Id.* at 538. And because no evidence of malice was produced, we held that "the qualified privilege prevailed." *Id.*

¶20.    More recently, in *Barmada*, this Court addressed statements made by the defendant physician, Dr. Pridjian, regarding a fellow physician's competence. *Barmada*, 989 So. 2d at 362. Dr. Pridjian made the allegedly defamatory comments to members of a hospital's heart team while performing surgeries, to other hospital physicians and staff, and to an independent reviewer. *Id.* Relying on *Hayden*, this Court ultimately held that the individuals to whom the communication was made "were directly interested in the matter; and therefore, the qualified privilege appli[ed]." *Id.* (citing *Hayden*, 407 So. 2d. at 537-38). We also addressed whether the privilege was overcome by a showing of malice or bad faith. *Id.* at 364 (citing *Eckman*, 893 So. 2d at 1052).[3] Holding that it was not, this Court reiterated the rule that we must "rely only on those [allegations of malice or bad faith] supported by evidence in the record." *Barmada*, 989 So. 2d at 364. As Barmada had failed to produce

---

[3] *Eckman* required this Court to analyze communications made between two physicians working for a utilization review company. *Eckman*, 893 So. 2d at 1052. The company had been employed to review whether procedures the plaintiff physician performed on two of Cooper Tire & Rubber Co.'s employees qualified for reimbursement. *Id.* at 1051. The plaintiff surgeon alleged the utilization review company's report contained defamatory statements. *Id.* at 1052. Ultimately, this Court held that (1) the contents of the report were protected under the qualified privilege, as the utilization-review company and the recipient, Cooper Tire, shared a direct interest in the subject matter of the communication—whether the surgeries qualified for employee reimbursement; and (2) no affirmative evidence of actual malice was provided to overcome the privilege's good-faith presumption. *Id.* at 1053-54.

9

affirmative evidence proving such, we affirmed the judgment and held that Pridjian's comments were protected by the qualified privilege. *Id.* at 365.

¶21. Inland and Dr. Okorie would bolster their argument with authority from other jurisdictions, but our caselaw more than adequately supports our decision, and further discussion is unnecessary. The principles set forth in *Hayden*, *Barmada*, and *Eckman* lead to the conclusion that physician-to-physician communications are protected under the qualified privilege, so long as the privilege's essential elements are satisfied. Here, those essential elements are satisfied.

¶22. Since the qualified privilege applied, Amerson was required to produce affirmative evidence of "malice, bad faith, or abuse." *See Barmada*, 989 So. 2d at 364. Malice, as defined by this Court, requires "knowledge of falsity or reckless disregard as to truth or falsity." *Eckman*, 893 So. 2d at 1053. When the qualified privilege applies, the plaintiff bears the burden of proving malice. *Hayden*, 407 So. 2d at 539.

¶23. Amerson produced no evidence of malice or bad faith on the part of Dr. Okorie. Instead, she merely argues that the results of her drug tests were incorrect and, therefore, that Dr. Okorie's communication to Dr. Morris relaying those results was false. But even assuming the results were wrong, Amerson has not shown Dr. Okorie knew of the falsity or acted in reckless disregard of the truth. In fact, Amerson has acknowledged the opposite—she concedes that it was "logical" for Dr. Okorie to believe the results because they had been produced from her urine sample.

**CONCLUSION**

10

¶24.    There was no genuine issue of material fact as to the substance of Dr. Okorie's communication to Dr. Morris regarding Amerson's drug-test results.  By all accounts, the communication concerned Amerson's continuing medical treatment and satisfied all of the elements of the qualified privilege.  Since Amerson failed to produce any evidence of malice, her defamation claims fail as a matter of law.  We reverse the circuit court's order and render summary judgment to the Defendants.

¶25.    **REVERSED AND RENDERED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR.**